[No. B186047. Second Dist., Div. One. June 28, 2006.]

In re EDUARDO M., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
EDUARDO M., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[*]]**

_____

[*]Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of Facts part II; Discussion parts II and III.

## Counsel

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**ROTHSCHILD, J.**—In the published portion of this opinion, we hold that when a criminal defendant or delinquent ward is convicted of aiding and abetting two felony firearm assaults, he cannot also be convicted of being an accessory to those felonies solely on the basis of his immediate flight from the scene and later denials of his own involvement, even if that conduct incidentally helped the shooter escape.

The juvenile court declared Eduardo M. a delinquent ward after the court found that he committed two assaults with a semiautomatic firearm by aiding and abetting the actual perpetrator, in both of which a principal was armed with a firearm (counts 1 and 2), and that he was also an accessory to the assaults (count 4).[1] (Welf. & Inst. Code, § 602, subd. (a); Pen. Code, §§ 245, subd. (b), 12022, subd. (a)(1), 32; all further undesignated section references are to the Welfare and Institutions Code.) Based on this case and an earlier sustained delinquency petition in which the court found that Eduardo had violated the terms of his probation, the court committed Eduardo to the Youth Authority for a maximum period of 13 years 8 months.[2]

Eduardo appeals, contending that (I) the finding that he was an accessory (count 4) must be reversed because his acts in aiding and abetting the assaults (counts 1 and 2) and helping the shooter escape did not sufficiently demonstrate a separate intent to aid the shooter's escape; (II) the findings that a principal was armed during both assaults (counts 1 and 2), and any related

---

[1] The court orally found the "principal armed" enhancement true only on count 1, and did not make a finding regarding the same enhancement on count 2. The court later included terms for both enhancements in calculating the maximum confinement time, and the Youth Authority Commitment Form lists both enhancements as having been found true. Because we conclude that both enhancements and any resulting potential custody time must be stricken (unpublished part of opinion), we need not resolve this discrepancy.

[2] The court orally calculated the maximum confinement time as 15 years 4 months, but later corrected that total through a nunc pro tunc order.

potential custody time, must be stricken because being armed with a firearm is an element of assault with a firearm; and (III) the court made several errors in its dispositional order, including (A) failing to determine whether Eduardo had exceptional educational needs; (B) failing to exercise its discretion in calculating his maximum confinement time; (C) declaring the accessory finding (count 4) to be a section 707, subdivision (b) offense; (D) incorrectly calculating his predisposition custody credits; (E) preparing the Youth Authority commitment form; and (F) committing him to the Youth Authority. (The Attorney General concedes issues II and III (B), (C), and (E).)

As explained in the published portion of the opinion, we agree with contention (I) and reverse the finding that Eduardo was an accessory (count 4). In the unpublished portion of the opinion, we agree with contentions (II) and (III) (A), (B), (D), and (E). We modify the adjudication and dispositional orders to strike the findings that a principal was armed during the commission of counts 1 and 2, and any related potential custody time. We also modify the dispositional order to strike the calculation of Eduardo's maximum confinement time and to award Eduardo 89 rather than 88 days of predisposition custody credit. Because we reverse with prejudice the count 4 finding that Eduardo was an accessory, we need not address whether count 4 qualified as a section 707, subdivision (b) offense. We remand for the court to conduct a new dispositional hearing at which it should determine whether Eduardo has special educational needs and determine his maximum possible confinement time, taking our opinion into account. Because those determinations may affect the court's decision whether a Youth Authority commitment is appropriate, we also vacate the Youth Authority commitment order, which the court should reconsider on remand. In all other respects, we affirm the judgment (order of wardship).

## FACTS

### I. The Adjudication Hearing.

On December 3, 2003, the juvenile court declared Eduardo, who was born in April 1989, a delinquent ward based on his admission that on July 6, 2003, he illegally drove a vehicle belonging to someone else. (Veh. Code, § 10851, subd. (a).) The juvenile court placed Eduardo home on probation on condition, among others, that he obey all laws and not "participate in any type of gang activity, or associate . . . with any known gang members."

Approximately one year later, about 11:00 a.m. on December 11, 2004, Hugo Bahena and his cousin Miguel Morales were walking to a store in Compton. Bahena had been, but no longer was, part of a graffiti "tagging crew" that fought with rival "taggers." A blue van with tinted windows drove up and stopped less than 30 feet from the two men. In addition to the driver, the van contained two other people, but neither Bahena nor Morales could identify any of the van's occupants. The van's passenger window was down, and a young male shouted, "where you from?" The two men understood the question asked whether they belonged to a gang. Bahena replied, "nowhere," meaning he and Morales were not gang members. The passenger then fired one shot from a semiautomatic pistol through the open window, hitting Bahena in the leg. Morales ran out of the line of fire, and the van drove off. Morales suspected that the van's occupants fired at Bahena because they belonged to a rival tagging crew with whom Bahena had fought in the past.

Morales helped Bahena walk to a nearby gas station, where someone called the police. About five minutes later, Eduardo drove up to the gas station in the van. Bahena and Eduardo were friends. Eduardo asked what happened, and Bahena replied that he had been shot. Morales said that Eduardo's van was the same one from which the shot was fired, and that Eduardo was involved in the shooting. Eduardo replied that he was not involved in the shooting, did not know who was, and that someone had carjacked the van, which he had just gotten back. While Eduardo was still at the gas station, sheriff's deputies and paramedics arrived. When Deputy Mark Raffalelli arrived, he saw Eduardo seated in the back of a patrol car, and heard Bahena yell at Eduardo, "why did you let your friends shoot me." Raffalelli saw Eduardo reply by shaking his head, "no, he didn't."

Raffalelli advised Eduardo of his *Miranda* rights, which he waived. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].) Eduardo began the interview by claiming "that he didn't know that the van was involved in a crime and that" his sister owned the van. Later, Eduardo changed his story: He admitted he was driving the van with two passengers, both gang members, one of whom he knew had a gun similar to the one Bahena saw the shooter fire. Eduardo's passengers were looking for rival gang members. When they saw the victims, whom Eduardo recognized, he pulled alongside and his armed passenger said he wanted to see who the victims were. The passenger called out, "where are you from?" When the victims replied that they were not gang members, Eduardo's passenger reached out and fired one shot, hitting Bahena. The shooter then told Eduardo "to step on it and get out of there." Eduardo said he "agreed," drove a short

distance, and stopped. Both his passengers got out and ran away. He drove back to the crime scene because he was a friend of the victims. Eduardo claimed he did not know his armed passenger intended to shoot anyone.

The juvenile court found that Eduardo assaulted Bahena and Morales with a firearm by aiding and abetting the shooter, and that in both assaults a principal was armed with a firearm (counts 1 and 2).[3] The court also found that Eduardo was an accessory to the same crime (count 4). Based on those findings, the court found that Eduardo had violated the terms of his probation in his 2003 case.

## II. The Disposition Hearing.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISCUSSION

### I. The Court Erred in Finding that Eduardo Both Aided and Abetted and Was an Accessory to the Assaults.

■ Eduardo contends the juvenile court erred in finding both that he aided and abetted the two assaults, making him liable as a principal (counts 1 and 2), and that he was an accessory to the same assaults (count 4). He does not challenge his two assault convictions but contends that his accessory conviction must be reversed and dismissed. We agree. We hold that because Eduardo was convicted as a principal in both assaults, he cannot also be convicted as an accessory to those assaults solely on the basis of his immediate flight from the scene of the crime and his subsequent denials of his own involvement, even if that conduct incidentally helped a coprincipal to escape.

■ In California both perpetrators and aiders and abettors are equally liable as principals. Penal Code section 31 defines principals as, among others, "[a]ll persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . ."

---

[3] See footnote 1, *ante.*

[*] See footnote, *ante*, page 1351.

" 'A person aids and abets the commission of a crime when he . . . , (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating, or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 851 [72 Cal.Rptr.2d 656, 952 P.2d 673]; see Pen. Code, § 31.)

On the other hand, a person is an accessory to a crime when "after a felony has been committed, [he] harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, . . . having knowledge that said principal has committed such felony . . . ." (Pen. Code, § 32; see *People v. Riley* (1993) 20 Cal.App.4th 1808, 1816 [25 Cal.Rptr.2d 676]; see *People v. Mouton* (1993) 15 Cal.App.4th 1313, 1324 [19 Cal.Rptr.2d 423].)

By its statutory definition of principals (Pen. Code, § 31), California eliminated several older common law distinctions between principals and accessories. At common law, parties to crimes included first degree principals (actual perpetrators); second degree principals (those actually or constructively present at the crime scene who aid and abet the actual perpetrator); accessories before the fact (those not actually or constructively present at the crime scene who aid and abet the felony, often called "instigators"); and accessories after the fact (accessories in California). These distinctions developed primarily to shield those participating in felonies who were not actual perpetrators (and who thus usually had less moral culpability) from the death penalty, the long-standing common law punishment for all felonies. (2 LaFave, Substantive Criminal Law (2d ed. 2003) Parties to Crime, § 13.1, pp. 326–336; 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Crimes, § 77, pp. 122–123.)

This common law tradition included the following rule: "A principal in either the first or second degree may not also become an accessory after the fact by his subsequent acts . . . [although] one who was only an accessory before the fact may also be an accessory after the fact." (2 LaFave, Substantive Criminal Law, *supra*, Post-Crime Aid, § 13.6(a), pp. 402–403, fns. omitted.) Many states still follow that rule. (*Jordan v. State* (2000) 272 Ga. 395 [530 S.E.2d 192, 194]; *State v. Hawkins* (1992) 326 Md. 270 [604 A.2d 489, 494–500]; *Staten v. State* (Fla. 1988) 519 So.2d 622, 625–626; *State v. Leja* (Minn.Ct.App. 2003) 660 N.W.2d 459, 465–466; *People v. Hartford* (1987) 159 Mich.App. 295 [406 N.W.2d 276, 278–279]; 2 LaFave, Substantive Criminal Law, *supra*, Post-Crime Aid, § 13.6(a),

pp. 402–403, fns. 25–26.) All of those cases permit the defendant to be *charged and tried* as both a principal and an accessory if the pretrial evidence supports both charges, but the cases require that the jury be told that the defendant cannot be *convicted* of both. If through erroneous instructions or jury error the defendant is convicted of both crimes, appellate remedies vary: Some courts vacate the less serious accessory conviction and affirm only the underlying felony conviction, while others permit both convictions to stand but prohibit multiple punishment.

California cases are divided over whether to adopt the rule that a person cannot be convicted or sentenced as both a principal and an accessory to the same felony. Several cases have expressed approval of the rule, though on varying grounds and largely in dicta. (*People v. Prado* (1977) 67 Cal.App.3d 267, 271–274 [136 Cal.Rptr. 521]; *People v. Francis* (1982) 129 Cal.App.3d 241 [180 Cal.Rptr. 873]; *People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1256 [222 Cal.Rptr. 686].) Of those cases, only in *Francis* did the Court of Appeal actually vacate an accessory conviction on the grounds that, as a matter of law, the defendant could not be convicted as both a principal and an accessory to the same crime. (*People v. Francis, supra,* 129 Cal.App.3d at pp. 251-253.) Two other cases, however, have expressed disapproval of that rule, although again largely in dicta. (*People v. Riley, supra,* 20 Cal.App.4th at pp. 1813–1817; *People v. Mouton, supra,* 15 Cal.App.4th at pp. 1321–1325.) Only in *Riley* did the Court of Appeal actually affirm separate convictions (and imposition of separate concurrent sentences) as both a principal and an accessory to the same crime. (*People v. Riley, supra,* 20 Cal.App.4th at pp. 1813–1817.)

We need not attempt to resolve that conflict in the case law, because we hold only that a defendant who is convicted as a principal cannot also be convicted as an accessory solely on the basis of his immediate flight from the crime scene and his subsequent denials of his own involvement, even if that conduct incidentally helps other principals to escape. Our holding is consistent with *Riley* (the only case that affirms convictions as both a principal and an accessory to the same crime) and *Mouton* (the other case that expresses disapproval of the common law rule) because the accessory convictions in those cases rested upon the fact that the defendants attempted to dispose of the murder weapons, not upon mere flight and self-exculpatory statements. (*People v. Riley, supra,* 20 Cal.App.4th at p. 1815 ["The conviction of accessory is based on defendant's act, the following day, of attempting to dispose of the gun."]; *People v. Mouton, supra,* 15 Cal.App.4th at p. 1324.)

Because *Riley* and *Mouton* are distinguishable, we need not express an opinion on whether they were correctly decided.[5]

Our holding is supported by the following reasoning: Nearly all felons, whether acting alone or in concert with others, intend before, during, and after committing the felony to escape being apprehended and punished for their crimes. Attempting to escape after committing a felony is an inherent part of committing the felony, involving in most cases acting on a previously formed intent. Thus, escaping does not create greater criminal culpability. Indeed, although Penal Code section 32 does not expressly so state, California long has recognized that a principal to a felony cannot become an accessory to that felony by attempting to make his own escape. (*People v. Wallin* (1948) 32 Cal.2d 803, 807–808 [197 P.2d 734]; *People v. Riley, supra,* 20 Cal.App.4th at p. 1816; *People v. Mouton, supra,* 15 Cal.App.4th at p. 1324; *People v. Prado, supra,* 67 Cal.App.3d at p. 271; *People v. Duty* (1969) 269 Cal.App.2d 97, 100 [74 Cal.Rptr. 606].) None of these cases discusses this concept in detail, and some appear to rely on an unexplained adoption of the common law rule that principals cannot be accessories to their own felonies. In any event, were it not so, every felon who tried to escape apprehension by fleeing from the crime scene thereby would become an accessory to his own felony, a result that would turn nearly every felony into two separate crimes and thus expand accessory liability beyond any reasonable relation to increased criminal culpability or societal harm.[6] Similar reasoning applies to a principal's postcrime denials of his own involvement.[7]

---

[5] The defendants in *Riley* and *Mouton* aided and abetted murders and fled from the scene with the shooters. Before being caught, each defendant tried to hide or dispose of the murder weapon. Both cases heavily relied on those facts as supporting convictions for both murder and being an accessory thereto. (*People v. Riley, supra,* 20 Cal.App.4th at pp. 1815–1817; *People v. Mouton, supra,* 15 Cal.App.4th at p. 1324.)

[6] We limit our discussion to postfelony attempts to escape apprehension, prosecution, or conviction *that are not themselves criminal acts.* Crimes such as carjacking a getaway car, kidnapping, killing, threatening, or assaulting a witness to prevent him from reporting the crime or assisting the felon's apprehension, or fleeing in a high-speed chase that endangers others are separate from the already completed underlying felony from which the principal is fleeing. Committing separate crimes while fleeing from a completed felony demonstrates greater criminal culpability, for which the defendant can incur additional liability should the prosecution choose to charge them. (To the extent that Eduardo's false denial to the deputies could be construed as giving false information to a peace officer in violation of Penal Code section 148, the prosecution chose not to charge that crime.) In contrast, we are discussing *noncriminal* acts done during flight from the underlying felony that potentially can subject one to criminal liability *only* as an accessory.

[7] We note that like Penal Code section 32, CALJIC No. 6.40 (Apr. 2006 ed.) states only that one charged with being an accessory must help a "principal" to escape, suggesting that a principal could be an accessory by fleeing from his own felony. In contrast, Judicial Council of California Criminal Jury Instructions (Jan. 2006) CALCRIM No. 400 states that to be an accessory, one must intentionally aid the escape of "another person" one knows was a principal to a felony. For the reasons stated, we agree with CALCRIM No. 400.

■ If a felon cannot be subjected to additional liability as an accessory for fleeing and denying his guilt, then the same rule should apply to a principal whose flight and denials have the incidental effect of helping a coprincipal to escape. Unlike when third persons who are not principals to a felony intentionally aid the felon's escape after the crime is completed, a principal who flees and thereby incidentally assists another principal in escaping does not thereby expand the circle of criminality beyond the original participants. Moreover, because immediate flight and denials of involvement are such ubiquitous features of criminal conduct, they are too equivocal to constitute separate *acts* supporting an inference that the fleeing and guilt-denying felon harbored a separate *intent* to aid the escape of his coprincipals. For a principal to be convicted as an accessory, which requires both separate acts and intent, the principal must do something more than flee and deny his own guilt.

Eduardo and the shooter fled together in the same car immediately after the felony assaults, and Eduardo's false statements to the victims and the deputies a few minutes later involved denials of only his and not the shooter's involvement. The record reveals nothing else that would support an accessory conviction. We therefore reverse the finding that Eduardo was an accessory. On remand, the trial court should dismiss that allegation with prejudice.

## II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The finding that Eduardo was an accessory (count 4) is reversed with prejudice. The adjudication and dispositional orders are modified to strike the findings that a principal was armed during the commission of counts 1 and 2, and any related potential custody time. The orders further are modified to strike the calculation of Eduardo's maximum confinement time, and to award him 89 rather than 88 days of predisposition custody credit. The matter is remanded for the court to dismiss count 4 and the armed enhancements on counts 1 and 2 with prejudice and conduct a new dispositional hearing at which it should exercise its discretion and determine whether Eduardo has special educational needs and his maximum possible confinement time in light of our holdings. Because the court's exercise of discretion at the new dispositional hearing may affect its decision whether a Youth Authority

---

*See footnote, *ante*, page 1351.

commitment is appropriate, the Youth Authority commitment order is vacated, and on remand the court should reconsider Eduardo's proper placement and make a new commitment order. In all other respects, the judgment (order of wardship) is affirmed.

Spencer, P. J., and Mallano, J., concurred.